# Exhibit 1

# COMMONWEALTH OF VIRGINIA



HENRICO CIRCUIT COURT
Civil Division
4309 E. PARHAM ROAD
RICHMOND VA 23228
(804) 501-5422

Summons

To: TRUSTESS SERVICES OF VIRGINIA         Case No. 087CL20009740-00
SERVE: BROCK & SCOTT, PLLC
484 VIKING DRIVE
STE 3
VIRGINIA BEACH VA 23452

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Tuesday, December 08, 2020

Clerk of Court:  HEIDI S BARSHINGER

by _____
(CLERK/DEPUTY CLERK )

Instructions:

Hearing Official:

Attorney's name:    MCLAUGHLIN, HENRY W
707 EAST MAIN STREET
SUITE 1050
RICHMOND VA 23219

**VIRGINIA:**

### IN THE CIRCUIT COURT OF HENRICO COUNTY
Civil Division
4301 East Parham Road
Henrico, Virginia 23228

**THERESA B. ROMAN,**

Plaintiff,

v.                                                          Civil Action No. CL20 - 9740

### U.S. BANK NATIONAL ASSOCIATION
### AS TRUSTEE FOR GSAA HOME EQUITY
### TRUST 2006-12, ASSET-BACKED
### CERTIFICATES, SERIES 2006-12
Please Serve:
CT Corporation Systems
4701 Cox Road, Suite 301
Glen Allen, Virginia 23060-6802
Registered Agent

### TRUSTEE SERVICES OF VIRGINIA, LLC
Please Serve:
Brock & Scott, PLLC
484 Viking Drive, Ste 3

Defendants.

### COMPLAINT

Theresa B. Roman ("Roman"), by counsel, sets forth to the Court the following:

### Parties

1.  Roman is a natural person who resides in the Commonwealth of Virginia.

2.  U.S. Bank National Association as Trustee for GSAA Home Equity Trust 2006-12, Asset-

    Backed Certificates, Series 2006-12 ("U.S. Bank") is a securitized trust doing business in

    the Commonwealth of Virginia and a corporate citizen of Ohio..

3.  Trustee Services of Virginia, LLC ("Trustee Services") is a for-profit Virginia corporation.

## Venue

4.  Venue is proper in this Court because this complaint challenges the validity of a disputed
    foreclosure which took place in Henrico County, Virginia of real estate located in
    Henrico County, Virginia and because the registered agent of U.S. Bank is located in
    Henrico County, Virginia.

## Facts

5.  On April 28, 2006, Roman's mother, the late Venice E. Briggs ("Briggs") entered
    $251,950.00 in which Venice Briggs was the borrower, and Madison Funding, Inc.
    ("Madison Funding") was the lender. The loan was evidenced by a note ("the note")
    signed by Briggs for the principal amount, payable to Madison Funding in monthly
    installments, beginning at $1,312.24 a month. The note was secured by a deed of trust
    ("the original deed of trust") signed by Briggs and Roman, whose name was then Teresa
    G. Wright, and recorded in the Clerk's Office of this Court("the public land records") on
    May 1, 2006 in the land records of the Clerk's Office of this Court ("the public land
    records") at Deed Book 4112, beginning at Page 2233 and became a lien on a residence
    ("the residence") owned by Briggs and Roman located at 5405 Wellington Ridge Road,
    Richmond, Virginia 23231 in Henrico County, Virginia. The deed of trust appointed
    Craig C. Erdmann, P.C. ("Erdmann") as trustee.

6.  The note recited that Mortgage Electronic Registration Systems ("MERS") was beneficiary
    of the deed of trust with legal title and gave MERS the authority to appoint a substitute
    trustee and to do all things required by law or custom of the lender and required MERS,
    on full payment on the note, to mark it satisfied. These provisions did not give MERS the

2

right to assign the note, which made no mention of MERS. The loan documents did not give MERS authority to assign the rights to the deed of trust or to assign the note.

7. On information and belief, in 2006, before the expiration of the deadline for U.S. Bank to obtain such loan under the terms of its securitized trust, MERS purported to assign the deed of trust to U.S. Bank, which listed the loan as an asset in at least one public filing. However, because MERS was not authorized under the loan documents to assign the rights to the loan, U.S. Bank did not obtain assignment of rights to the loan until after a deadline to obtain such rights; As a securitized trust, U.S. Bank agreed to be bound by New York law as to the securitization trust. A New York statute provided that any action in contravention of a trust was void. U.S. Bank, although listing the loan as an asset within the deadline, did not obtain the note until after the deadline, and, because of the said New York statute and the provisions of the trust, never obtained the note at all.

8. Claiming to the owner of the note, U.S. Bank engaged Ocwen Loan Servicing, LLC ("Ocwen") as purported servicer as to the loan.

9. At the time of the execution of the note, the residence was owned by Briggs and Roman, as tenants by the entireties with right of survivorship as at common law.

10. On or about August 31, 2006, Briggs died, as a result of which Roman (then Teresa G Wright) became sole owner of the residence, subject to the lien of the deed of trust. In September 2006, Roman (then Teresa Wright) re-executed the deed of trust to correct a technical error in the description of the residence in the deed of trust. The re-recorded deed of trust ("the current deed of trust") was recorded in the public land records on September 12, 2006 in the public land records in Deed Book 4197, beginning at Page 0662 as Instrument No. 51727.

3

11. A copy of the current deed of trust is attached hereto marked "Exhibit A."

12. The deed of trust, at paragraph 22, provided, in pertinent part, as follows:

NON-UNIFORM COVENANTS. Borrower and Lender …covenant and agree as follows:

**Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument. . . .**

. . . .

**The notice shall specify (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date of notice is given to the Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.**

. . . .

**The notice shall … inform Borrower . . . . of the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.**

. . . . .

**If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums         secured     by     this Security Instrument without further demand and may  invoke  the  power  of  sale and any other remedies permitted by Applicable Law. ……**

…..

**…..Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a         newspaper      having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the property ….**

…..

**Trustee shall deliver to the purchase Trustee's deed conveying the Property with special warranty of title……**

13. The deed of trust identified Briggs and Roman (then Teresa Wright) as "Borrower (trustor)."

14. Because the deed of trust was re-executed and re-recorded as the current deed of trust

September 2006, and because the current deed of trust (Exhibit A) recited that Briggs had

died, and because, in accordance with the requirements of its securitized trust, U.S. Bank

4

obtained assignment of the note in 2004, U.S. Bank, as holder of the note and beneficiary of the deed of trust, was on notice by September 2016 that Briggs had died and that the only signatory of the original deed of trust still alive was Roman (then Teresa Wright) and that the only signatory still alive of the current deed of trust was Roman (then Teresa Wright).

15. Subsequent to Briggs' death, Roman sent to the servicer of the loan a copy of the death certificate of Briggs and the appointment of Roman as personal representative of Briggs.

16. Paragraph 15 of the original deed of trust and paragraph 15 of the current deed of trust provided that notice to one of the two borrowers identified in the deed of trust (Briggs and Roman – although only Briggs was borrower as to the note) would be notice to both. For a significant number of years prior to 2017, U.S. Bank has known that the only person to whom it could send the notice required by paragraph 22 of the deed of trust (recited in paragraph 12 herein) – for a considerable number of years – has been Roman, because Roman (previously Teresa Wright) was the only "Borrower" identified in the original deed of trust and the current deed of trust who has remained alive since September 2006, and only Roman has had the status as personal representative of Briggs.

17. As a result of the facts recited in paragraph 15 of this complaint, for a significant number of years, U.S. Bank has known that it could only comply with its requirement to send a 30-day cure notice required by paragraph 22 of the deed of trust (as a precondition required for foreclosure) by sending that notice to Roman (previously Teresa Wright) and that U.S. Bank could not comply with the requirement of a cure notice set forth in paragraph

5

Case 3:21-cv-00813-DJN   Document 1-1   Filed 12/29/21   Page 8 of 38 PageID# 15

22 of the deed of trust by sending a cure notice addressed to Briggs.

18. Attached hereto marked "Exhibit B" is a document dated July 12, 2017 from Ocwen addressed to "Venice E. Briggs" at the address of the residence.

19. Exhibit B did not comply with the cure notice requirement of paragraph 22 of the deed of trust because it was addressed to Briggs and not to Roman (either to her present name or her prior name of Teresa Wright).

20. No lender entity ever complied with the cure notice requirement in paragraph 22 of the deed of trust.

21. Exhibit B set forth a deadline of August 18, 2017 for cure of default.

22. Sometime after August 18, 2017, U.S. Bank, through Ocwen, purported to accelerate the note. However, under the terms of paragraph 22 of the deed of trust, U.S. Bank was not entitled to accelerate the note because (a) Exhibit B did not comply with the cure notice requirement of paragraph 22 of the deed of trust (for the reason set forth in paragraph 18 of this complaint) and (b) no lender entity ever sent a proper 30-day cure notice pursuant to paragraph 22 of the deed of trust.

23. U.S. Bank, through Ocwen, executed a document which stated that it removed Erdmann as trustee and appointed Trustee Services of Virginia, LLC ("Trustee Services") as substitute trustee. However, because U.S.; Bank was not owner of the note it did not, in fact, do so.

24. U.S. Bank, through Ocwen, instructed Trustee Services to foreclose on the residence. However, U.S. Bank was not entitled to foreclose on the residence and Trustee Services was not empowered to foreclose on the residence because, as set forth herein above, no lender entity ever complied with the 30-day cure notice requirement set forth in

6

paragraph 22 of the deed of trust as a precondition to foreclosure of the residence.

25. Although not empowered to foreclose on the residence (because, for the reasons set forth herein above, U.S. Bank did not obtain ownership of the loan; separately because U.S. Bank had not complied with the cure notice requirements of the deed of trust), in response to the said instruction by U.S. Bank (though Ocwen), Trustee Services advertised the residence for foreclosure at 3:30 p.m. on January 18, 2018.

26. After such advertisement, Roman retained legal counsel, who wrote counsel for Trustee Services requesting a copy of such cure notice that was being relied upon as to the scheduled foreclosure of the residence for compliance with the cure notice pre-condition to foreclosure set forth in paragraph 22 of the deed of trust.

27. After such request was made by Roman's counsel, such counsel received Exhibit B and showed Exhibit B to Roman, who had not previously seen Exhibit B. Thus, Exhibit B was not received by Roman before the deadline set forth in Exhibit B or before the purported acceleration of the note by U.S. Bank after the deadline set forth in Exhiibit B.

28. Because of the facts averred in paragraph 27 of this complaint, the fact that Roman viewed Exhibit B after the deadline in Exhibit B did not act as a corrective of any kind to the failure of U.S. Bank or any lender entity to send a proper 30-day cure notice in compliance with paragraph 22 of the deed of trust.

29. Because of the facts set forth herein above in this complaint, there was  never compliance with the cure notice requirement of paragraph 22 of the deed of trust. Therefore, U.S. Bank never gained the right to foreclose on the residence and Trustee Services was never empowered to foreclose on the home.

30. Prior to 3:15 p.m. on January 18, 2018, Roman, by counsel, filed a lawsuit and a lis pendens

7

and Roman's counsel advised Trustee Services of such lawsuit and asked that Trustee Services cancel the foreclosure of the residence scheduled for 3:15 p.m. on January 18, 2018.

31. After the facts averred herein above in this complaint, Trustee Services asked U.S. Bank for its position regarding such lawsuit and whether the foreclosure of the residence scheduled for 3:15 p.m. on January 18, 2018 should be stopped.

32. U.S. Bank responded by taking the position that the foreclosure should proceed.

33. At or about 3:15 p.m. on January 18, 2018, Trustee Services conducted a purported foreclosure ("the purported foreclosure") of the residence, at which U.S. Bank made the high bid at $310,000.

34. In conducting such foreclosure, Trustee Services acted on its own and as agent for U.S. Bank.

35. In acting through Trustee Services to conduct the purported foreclosure, and in making the high bid, U.S, Bank acted as a stranger to the note, alternatively breached the cure notice requirement of the deed of trust.

36. Trustee Services executed a purported trustee's deed ("the purported trustee's deed") and delivered it to U.S. Bank which caused it to be recorded in the public land records.

37. In executing and delivering the purported trustee's deed, Trustee Services acted on its own and as agent for U.S. Bank. '

38. In acting through Trustee Services for execution of the purported trustee's deed, in receiving the purported trustee's deed, and in causing the purported trustee's deed to be recorded in the public land records, U.S. Bank acted pursuant to a defective foreclosure because U.S. Bank acted to cause the foreclosure as a stranger to the deed of trust; alternatively, acted

8

in breach of the cure notice requirements of the deed of trust.

39. After the purported foreclosure, U.S. Bank obtained a judgment for possession of the home in an unlawful detainer case filed originally in this Court against Warrant Roman, as to which the Virginia Supreme Court refused a petition for appeal and a petition to rehear in that refusal.

40. After the purported foreclosure, the Virginia Supreme Court issued a decision in *Young-Allen v. Bank of Am., NA.,* 2020 Va. LEXIS *32;* 839 S.E. 2d *987* (2020) holding that where a borrower challenged a foreclosure on grounds the lender sent an inflated cure notice that breached a cure notice requirement in a deed of trust, and where the borrower sued for rescission and damages against the lender and a substitute trustee, after filing a pre-foreclosure lawsuit with a lis pendens prior to the foreclosure, a claim for rescission and for damages against the lender and the substitute trustee filed after a disputed foreclosure would not survive demurrer unless the borrower pled that the borrower would have brought the loan current if sent a proper cure notice.

41. The facts in this case are like those *Young-Allen* in the following respects: (a) Roman avers that there was an invalid cure notice; (b) Roman does not aver that if she had received a cure notice, she would have been able to cure default in the note: (c) she filed a declaratory judgment action before the disputed foreclosure calling on a defendant planning to act in a claim of status as substitute trustee to sell a residence; (c) she sought in such lawsuit a declaratory judgment that such a foreclosure would be invalid; and (d) th3e foreclosure went forward anyway.

42. The facts in this case are different from those in *Young-Allen* in the following respects:

Roman avers that U.S. Bank was not the owner of the note; and (b) the incorrect cure notice was not sent to Roman at all, rather to her deceased co-obligor, and (c) Roman never received the cure notice.

43. When Roman acted prior to the purported foreclosure to seek cancellation by Trustee Services of the foreclosure, *Young-Allen* had not been decided. Under a case decided by the Circuit Court of Fairfax County, Virginia, at that time, if there was a *bona fide* challenge to the foreclosure, a party planning to foreclose under claim of acting as substitute trustee had a fiduciary duty to cancel the foreclosure and seek the guidance of a court of competent jurisdiction. See *Bremer v. Bitner*, 44 Va. Cir. 505 (Fairfax Cir. Ct. 1996). The lawsuit filed by Roman was a bona fide challenge to the validity of the foreclosure.

44. U.S. Bank removed to the U.S. District Court for the Eastern District of Virginia the lawsuit filed by Roman. In that lawsuit, she averred, on information and belief, that U.S. Bank had become holder of the note. However, that case was dismissed without prejudice, so that that averment is not res judicata in this case.

45. Subsequent to the denial by the Virginia Supreme Court of Warrant Roman's appeal of the eviction order as to him, U.S. Bank has advertised the residence for sale on the Internet, not advising of any challenge to the foreclosure and advising potential bidders

46. Because of the facts set forth above, there are grounds for this Court to enter an order striking the purported trustee's deed from the public land records and to enter an order for restoration of the status quo ante, with return of title to the residence to Roman, subject to the lien of the deed of trust.

47. Roman cannot obtain an adequate remedy at law.

10

## Conclusion

WHEREFORE, Roman prays that the Court enter an order with the effect of restoration to

Roman of ownership of the residence, subject to the lien of the deed of trust, by an order to that effect,

for restoration of the *status* quo ante.

Respectfully submitted,

THERESA B. ROMAN,

By _____
        Counsel

Henry W. McLaughlin (VSB No. 07105)
Law Office of Henry McLaughlin, P.C.
707 East Main Street, Suite 1050
Richmond, Virginia 23219
(804) 205-9020; fax (877) 575-0245
henry@mclaughlinvalaw.com
*Counsel for Theresa B. Roman*

Exhibit A

JUL. 25. 2007  10:18AM

NO. 5291   P.  17



BK4197PG0664        BK4112PG2199

\*\*\*This Document is being re-recorded to correct the legal description\*\*\*

This Instrument prepared by:

After Recording Return To:
MADISON FUNDING, INC.
2530 N. CHARLES STREET, STE. 300
BALTIMORE, MARYLAND 21218
Loan Number

Tax Map Reference No.:
PIN:   842-693-7574

------------------ [Space Above This Line For Recording Data] ------------------

## DEED OF TRUST

MU

The following information, as further defined below, is provided in accordance with Virginia law:

This Deed of Trust is given by VENICE E. BRIGGS AND THERESA G. WRIGHT AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP

as Borrower (trustor), to LAW OFFICES OF CRAIG C. ERDMANN, P.C.

as Trustee, for the benefit of Mortgage Electronic Registration Systems, Inc., as beneficiary.

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated APRIL 28, 2006          , together with all Riders to this document.
(B)  "Borrower" is VENICE E. BRIGGS AND THERESA G. WRIGHT AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP

Borrower is the trustor under this Security Instrument.
(C)  "Lender" is MADISON FUNDING, INC.

Lender is a A MARYLAND CORPORATION                                    organized
and existing under the laws of MARYLAND
Lender's address is 2530 N. CHARLES STREET, STE. 200, BALTIMORE, MARYLAND
21218

VIRGINIA—Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic eForms 800-649-1362
Form 3047 1/01                                            Page 1 of 14                          www.docmagic.com



JUL. 25. 2007 10:18AM                                      NO. 5291    P. 18



BK4112PG2200

EK4197PG0665

(D) "Trustee" is LAW OFFICE OF CRAIG C. ERDMANN, O.C.

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is 2807 N. PARHAM ROAD STE 205, RICHMOND, VIRGINIA 23294

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated APRIL 28, 2006 . The Note states that Borrower owes Lender TWO HUNDRED FIFTY-ONE THOUSAND NINE HUNDRED FIFTY AND 00/100 Dollars (U.S. $ 251,950.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MAY 1, 2036 .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider        ☐ Condominium Rider            ☐ Second Home Rider
☐ Balloon Rider                ☐ Planned Unit Development Rider  ☐ Other(s) [specify]
☐ 1-4 Family Rider             ☐ Biweekly Payment Rider

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" mean those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS        DocMagic eForms 800-649-1362
Form 3047 1/01                                          Page 2 of 14                     www.docmagic.com



JUL. 26. 2007 10:19AM                                             NO. 5291   P. 19



BK4197P60666  BK4112PG2201-

(R)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
              COUNTY       of HENRICO                                              :
              (Type of Recording Jurisdiction)        (Name of Recording Jurisdiction)
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS
EXHIBIT "A".

which currently has the address of  5405 WELLINGTON RIDGE ROAD
                                                    (Street)

          RICHMOND              , Virginia   23231      ("Property Address"):
           (City)                           (Zip Code)

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic eForms  800-649-1362
Form 3047 1/01                                    Page 3 of 14                      www.docmagic.com



JUL. 25. 2007 10:19AM                                                    NO. 5291   P. 20



BK4197PG0667        BK4112PG2202

use or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.



JUL. 25, 2007 10:19AM                                          NO. 5291   P. 21





Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which





8744 12PG2204
BK4197PG0669

reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not

DocMagic Direct 800-649-1362
www.docmagic.com



JUL. 25. 2007  10:20AM                                    NO. 5291   P. 23



BK4197P60670   BK4112P62205

Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and it not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay



Case 3:21-cv-00813-DJN    Document 1-1    Filed 12/29/21    Page 22 of 38 PageID# 29
Case 3:18-cv-00157-HEH    Document 1-3    Filed 03/08/18    Page 18 of 34 PageID# 27

JUL. 25. 2007  10:21AM

NO. 5291    P. 24



BK4197PG0671    BK4112PG2206

Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender for any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value;

JUL. 25. 2007 10:21AM                                        NO. 5291    P. 25





8K4197PG0672

unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or less in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

11. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

12. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

13. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed

VIRGINIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3047 1/01                    Page 9 of 14                    Docmagic @forms 800-649-1362
                                                                 www.docmagic.com



. JUL. 25, 2007 10:22AM                                                    NO. 5291   F. 26



BK4112PG2208

BK4197PG0673

are a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



JUL. 25. 2007 10:22AM                                                    NO. 5291   P. 27



BK4197P60674   <s>BK4112P62269</s>

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an





Case 3:21-cv-00813-DJN   Document 1-1   Filed 12/29/21   Page 26 of 38 PageID# 33
Case 3:18-cv-00157-HEH   Document 1-3   Filed 03/08/18   Page 22 of 34 PageID# 31

JUL. 25. 2007 10:23AM                                                    NO. 5291   P. 28



BK4197PG0675                    BK4112PG2210

Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if there costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any lien of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

VIRGINIA—Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS                DocMagic eForms 800-649-1362
Form 3047 1/01                          Page 12 of 14                                   www.docmagic.com



JUL. 25. 2007 10:23AM                                    NO. 5291   F. 29



BK4197PG0676   BK4117ZPG2211

21. Release. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

22. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witness:                                Witness:


_Venice E. Briggs_ (Seal)              _Theresa G. Wright_ (Seal)
VENICE E. BRIGGS    -Borrower           THERESA G. WRIGHT    -Borrower


_____ (Seal)                  _____ (Seal)
               -Borrower                                -Borrower


_____ (Seal)                  _____ (Seal)
               -Borrower                                -Borrower


VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic EFarms 800-649-1362
Form 3047 1/01                          Page 13 of 14                              www.docmagic.com



JUL. 25. 2007 10:23AM                                         NO. 5291   P. 30



BK4 1 1 2PG22 12

BK4197PG0677

State of Virginia
County of HENRICO

The foregoing instrument was acknowledged before me this APRIL 28, 2006
by VENICE D. BRIGGS, THERESA G. WRIGHT

He/She/They/is/are personally known to me or has/have produced    VIRGINH DRIVER'S
as identification.                                                LICENSES

 
Signature of Person Taking Acknowledgment

NOTARY PUBLIC
Title or Rank

( NONE )
Serial Number, if any

(Seal)                          My commission expires the 30 TH    day of
                                NOVEMBER, 2009

VIRGINIA—Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS    DocMagic eForms 800-649-1362
Form 3047 1/01                          Page 14 of 14                        www.docmagic.com



JUL. 25. 2007 10:24AM                                    NO. 5291   P. 31

BK 4197PG0676 RK44+2P6224-3

## ADJUSTABLE RATE RIDER
(LIBOR Six-Month Index (As Published by the Wall Street Journal) - Rate Caps
Accrued Interest Only for Fixed Rate Period)

THIS ADJUSTABLE RATE RIDER is made this 26th day of APRIL  2006
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to HADISON FUNDING, INC., A
MARYLAND CORPORATION                                               ("Lender")
of the same date and covering the property described in the Security Instrument and located at:

5405 WELLINGTON RIDGE ROAD, RICHMOND, VIRGINIA 23231
Property Address

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND
THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE
CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A.     INTEREST RATE AND MONTHLY PAYMENT CHANGES
       The Note provides for an initial interest rate of       6.250 %.  The Note provides for
changes in the interest rate and the monthly payments, as follows:

4.     INTEREST RATE AND MONTHLY PAYMENT CHANGES
       (A) Change Dates
       The interest rate I will pay may change on the 1st    day of MAY 2009
and on that day every six months thereafter.  Each date on which my interest rate could change is called a
"Change Date."
       (B) The Index
       Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is
the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market
as published by the Wall Street Journal.  The most recent Index figure available as of the date 45 days before
each Change Date is called the "Current Index."
       If the Index is no longer available, or is no longer published, the Note Holder will choose a new
index that is based upon comparable information.  The Note Holder will give me notice of this choice.
       (C)  Calculation of Changes
       Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO AND 250/1000                             percentage points (    2.250 %)



JUL. 29. 2007 10:24AM                                          NO. 5291   P. 32



BK4∥97PG0679 ᴴᴷ⁴⁺⁺²ᴾᴳ²²ᴸᴸ

to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125% ). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full at the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.250 % or less than 2.250 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000 percentage point ( 1.000 % ) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 12.250 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this

Adjustable Rate Rider
Greenpoint Mortgage Funding                    Page 2 of 3                    0027BMU 04/02
                                                                             Form 3152 USING DocMagic
                                                                             800/51-1212 www.docmagic.com



JUL. 25. 2007 10:24AM

NO. 5291   P. 33



BK4R97PG0580 BK4112PG2245

Security Instrument). Borrower will continue to be obligated under the Note and this
Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give
Borrower notice of acceleration. The notice shall provide a period of not less than 30 days
from the date the notice is given in accordance with Section 15 within which Borrower
must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums
prior to the expiration of this period, Lender may invoke any remedies permitted by this
Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable
Rate Rider .

_Venice E. Briggs_  4/28/06   (Seal)
VENICE E. BRIGGS        -Borrower

_Theresa D. Wright_  4/28/06   (Seal)
THERESA G. WRIGHT       -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

[Sign Original Only]

Adjustable Rate Rider                                    DO33RAU 04281
Onetopoint Mortgage Funding        Page 3 of 3        Form Filled Using DocMagic
                                                       800-mp-1303  www.docmagic.com



' JUL. 25 2007 10:24AM                                      NO. 5291   P. 34



BK4197PG0681
BK4112PG2216

#### EXHIBIT "A"

ALL that certain lot, piece or parcel of land, with all improvements thereon and appurtenances thereto belonging, lying, being and situate in Varina Magisterial District, Henrico County, Virginia, shown and designated as Lot 16, Block C, Section C, Wellington Woods, as shown on subdivision plat of "Wellington Woods, Section C," made by Shadrach & Neal, Inc., dated May 6, 2005, and recorded May 27, 2005, in the Clerk's Office of the Circuit Court of Henrico County, Virginia, in Plat Book 121, pages 77 through 80, to which plat reference is hereby made for a more particular description of the property.

BEING part of the real property conveyed to Windswept Development, LLC, a Virginia limited liability company, by deed of assumption from W. V. McClure, Inc., t/a Main Street Homes, a Virginia corporation, dated October 25, 2004, and recorded December 13, 2004, in the Clerk's Office of the Circuit Court of Henrico County, Virginia, in Deed Book 3789, page 1256.

AND FURTHER BEING the same real property conveyed to Venice E. Briggs and Theresa G. Wright by deed from Windswept Development, LLC, and W. V. McClure, Inc., t/a Main Street Homes, dated April 26, 2006, and recorded contemporaneously herewith.

※ Block B

† Said Venice Briggs departed from this life on or
around August 3½, 2006, leaving sole ownership of the
property to Theresa G. Wright as sole surviving joint
tenant with rights of survivorship

INSTRUMENT #23825
RECORDED IN THE CLERK'S OFFICE OF
HENRICO COUNTY ON
MAY 1: 2006 AT 03:02PM
YVONNE S. SMITH, CLERK

RECORDED BY: KLB



JUL. 25. 2007  10:25AM

NO. 5291    P. 35

BK 4ll 97P60682

Theresa G. Wright

Vanice E. Briggs

STATE OF VIRGINIA
County of Henrico

The foregoing Deed of Trust is being reacknowledged to correct the legal
description (specifying property as belonging in Block "B" and not in Block "C") before me
a notary public on the ____ day of __September_____, 2006 in the
jurisdiction aforesaid by Theresa G. Wright and Vanice E. Briggs.

My Commission Expires:

3 / 31 / 2010

Notary Public

INSTRUMENT #51727
RECORDED IN THE CLERK'S OFFICE OF
HENRICO COUNTY ON
SEPTEMBER 12: 2006 AT 10:30AM
YVONNE E. SMITH, CLERK

RECORDED BY: TDC



**Exhibit B**



**Ocwen Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

07/12/2017

Sent Via First Class Mail
2321634659
Loan Number: 7131477965

Venice E Briggs
5405 WELLINGTON RIDGE RD
RICHMOND, VA 23231-6563

Property Address: 5405 Wellington Ridge Rd
Richmond, VA 23231-6563

## NOTICE OF DEFAULT

### AVISO IMPORTANTE PARA PERSONAS QUE HABLAN ESPAÑOL:

Esta notificación es de suma importancia. Puede afectar su derecho a continuar viviendo en su casa. Si no entiende su contenido, obtenga una traducción inmediatamente o contáctenos ya que tenemos representantes que hablan español y están disponibles para asistir.

### SPECIAL NOTICE IN THE EVENT YOU HAVE FILED BANKRUPTCY

If you have received an Order of Discharge in a Chapter 7 case filed under the Bankruptcy Code of the United States, this notice is not intended as an attempt to collect any debt from you personally. If you have received an Order of Discharge in a Chapter 11, 12 or 13 bankruptcy case, this notice is not an attempt to collect a pre-petition debt pursuant to a completed and confirmed Bankruptcy Plan. If the foregoing applies to you, this notice is sent to you only as a preliminary step to an "In Rem" foreclosure on the mortgage against the above-referenced property. Provisions may be contained within the mortgage/deed of trust that requires notice prior to foreclosure. As such, this is not an attempt to assert that you have any personal liability for this debt contrary to any entered Bankruptcy Order of Discharge.

In addition, if you have recently filed a petition under the Bankruptcy Code, this notice has been sent to you because we have not been notified of your bankruptcy case. If the foregoing applies to you, it is **IMPORTANT** that you or your bankruptcy attorney contact us immediately and provide us with the following information: date and jurisdiction of your filing, your case number and the bankruptcy chapter number under which you have filed.

---

NMLS # 1852                                                                    DEMAND05BKDCM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*





**Ocwen Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

Mortgage payments on the above referenced account are past due, which has caused a default under the terms of the Mortgage or Deed of Trust. As of **07/12/2017**, the following amounts are past due:

| | |
|---|---|
| Principal and Interest | $102,074.84 |
| Interest Arrearage | $0.00 |
| Escrow | $16,192.15 |
| Late Charges | $2,028.51 |
| Insufficient Funds Charges | $0.00 |
| Fees / Expenses | $4,345.80 |
| Suspense Balance (CREDIT) | $972.19 |
| Interest Reserve Balance (CREDIT) | $0.00 |
| **TOTAL DUE** | **$123,669.11** |

In order to cure the default, payment for the entire total amount past due plus any amount(s) that become(s) due in the interim must be received on or before **08/18/2017**, at the address listed on page four of this notice. Payment must be received via MoneyGram, bank check, money order or certified funds. Please be aware that, after acceleration of the debt, there may be expenses and attorney's fees and costs incurred by us to enforce the terms of the mortgage agreement, in addition to the overdue amount on the mortgage. Any payment to reinstate the mortgage loan after acceleration must therefore include an amount sufficient to cover such expenses and fees incurred. Payments received that are less than the amount required to reinstate the mortgage loan will be returned, and will not stop any foreclosure proceedings that have begun. PRIOR TO SUBMITTING A PAYMENT, PLEASE CALL US TO VERIFY THE EXACT AMOUNT PAST DUE ON THE ACCOUNT.

Failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. Upon acceleration, the total obligation will be immediately due and payable without further demand. In foreclosure proceedings, we are entitled to collect the total arrearage in addition to any expenses of foreclosure, including but not limited to reasonable attorney's fees and costs. A borrower has the right to reinstate the loan after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense to acceleration and sale.

We will work with bankruptcy lawyers, foreclosure defense lawyers, housing counselors, and other authorized representatives of our customers. However, we will only release information once written authorization has been obtained, as required by law.

In addition, a HUD counseling agency may be able to provide assistance. To locate the HUD-approved counseling agency, call the HUD Housing Counseling Service at 800.569.4287 or consult HUD's website at www.HUD.gov.

**Attention Servicemembers and Dependents:** Servicemembers on "active duty" or "active service," or a spouse or dependent of such a servicemember, may be entitled to certain legal protections under the federal Servicemembers

NMLS # 1852                                                                                                    DEMAND05BKDCM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*



Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

Civil Relief Act (50 U.S.C. App. §§ 501-597b) ("SCRA") regarding the servicemember's interest rate and foreclosure protections. SCRA and certain state laws provide important protections for you. If you are currently in the military service, or have been within the last twelve (12) months, please notify OCWEN immediately. Servicemembers and dependents with questions about the SCRA should contact their unit's Judge Advocate, or their installation's Legal Assistance Officer. A military legal assistance office locator for all branches of the Armed Forces is available at http://legalassistance.law.af.mil/content/locator.php. Military OneSource is the U.S. Department of Defense's information resource. If you are listed as entitled to legal protections under the SCRA, please go to www.militaryonesource.mil/legal or call 800.342.9647 (toll free from the United States) to find out more information. Dialing instructions for areas outside the United States are provided on the website. Homeowner counseling is also available at HUD-certified housing counselors (http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm). You can also contact us toll-free at 800.746.2936 if you have questions about your rights under SCRA.

If the account cannot be brought current, we should be contacted immediately to discuss possible alternatives to foreclosure. OCWEN wants to help remedy the delinquent status of this account. We would like to discuss the alternatives that might be available. While our primary objective is the collection of past due amounts on the loan, we want to work to find the best available alternative to bring the account current.

Please visit our website at www.ocwencustomers.com where the account can be reviewed and financial information entered.

If you have any questions or concerns please call us toll-free at 800.746.2936. We are available Monday through Friday 8 am to 9 pm, Saturday 8 am to 5 pm and Sunday 9 am to 9 pm ET.

Archana B.R. has been assigned as your relationship manager and will be your designated representative for resolution inquiries and submission of documents.

Sincerely,
Loan Servicing
Toll Free Phone: 800.746.2936

ADDRESS WRITTEN CORRESPONDENCE TO:
Ocwen Loan Servicing, LLC
Attention: Research Department
P.O. Box 24736
West Palm Beach, FL 33416-4736



NMLS # 1852                                                                                              DEMAND05BKDCM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*





Page 3 of 4



**Ocwen Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

## PAYMENT REMITTANCE INFORMATION
### (Always include loan number 7131477965 with any payment)

#### Certified Payment Methods

| Western Union | MoneyGram |
|---|---|
| Code City: OCWEN<br>State: Florida<br>Reference: Loan number ~~████████~~<br>Agent Locator: 800.225.5227 | Receiver Code: 2355<br>Payable to: Ocwen Loan Servicing, LLC<br>City, State: Orlando, Florida<br>Reference: Loan number 7131477965<br>Agent locator: 800.926.9400 |

| Mail a Money Order/Certified Check | Bank Wire |
|---|---|
| For regular mail:<br>Ocwen Loan Servicing, LLC<br>P.O. Box 660264<br>Dallas, TX 75266-0264<br>For Overnight/Certified mail:<br>Ocwen Loan Servicing, LLC<br>Box # 660264<br>1010 W. Mockingbird Lane, Suite 100<br>Dallas, TX 75247 | Bank: Wells Fargo Bank, NA<br>ABA: ~~████████~~<br>Account Number: ~~████████~~<br>Account Name: Ocwen Loan Servicing, LLC<br>Reference: Loan number ~~████████~~ and<br>Property Address and Borrower Name<br>Email: wire details to Transferfunds@ocwen.com |

NMLS # 1852                                                                                                                      DEMAND05BKDCM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*